**Slip Op. 12-7**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANTOU RED GARDEN FOODSTUFF CO., LTD., | |
| Plaintiff, | Before: Timothy C. Stanceu, Judge |
| v. | |
| UNITED STATES, | Court No. 05-00080 |
| Defendant. | |

<u>OPINION AND ORDER</u>

[Affirming in part, and remanding in part, final determination and amended final determination issued by the U.S. Department of Commerce in an investigation of sales at less than fair value of shrimp from the People's Republic of China]

Dated: January 13, 2012

*John J. Kenkel*, *J. Kevin Horgan*, and *Gregory S. Menegaz*, deKeiffer & Horgan, of Washington, D.C., for plaintiff.

*Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Peter D. Keisler*, Assistant Attorney General, and *David M. Cohen*, Director.  Of counsel on the brief were *Kemba Eneas*, *Marisa B. Goldstein*, and *Christine J. Sohar*, International Attorney-Advisors, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge: Shantou Red Garden Foodstuff Co., Ltd. ("Red Garden") challenges the

final determination ("Final Determination"), and its amendment ("Amended Final

Determination"), issued by the International Trade Administration, U.S. Department of

Commerce ("Commerce" or the "Department") to conclude an investigation of sales at less than

fair value of certain frozen warmwater shrimp ("subject merchandise") imported from the

People's Republic of China ("PRC" or "China") from April 1, 2003 to September 30, 2003 (the

"period of investigation" or "POI").  Compl. ¶ 1 (Mar. 1, 2005), ECF No. 7; *see Notice of Final*

*Determination of Sales at Less Than Fair Value: Certain Frozen & Canned Warmwater Shrimp*

*From the People's Republic of China*, 69 Fed. Reg. 70,997 (Dec. 8, 2004) ("*Final*

*Determination*"); *Notice of Amended Final Determination of Sales at Less Than Fair Value &*

*Antidumping Duty Order: Certain Frozen Warmwater Shrimp from the People's Republic of*

*China*, 70 Fed. Reg. 5,149 (Feb. 1, 2005) ("*Amended Final Determination*").[1]  Before the court is

plaintiff's USCIT Rule 56.2 motion for judgment on the agency record and supporting

memorandum, which bring seven claims: (1) that Commerce unlawfully drew an adverse

inference in selecting from among the "facts otherwise available" for certain sales by Red

Garden in the United States, Mem. in Supp. of Pl. Shantou Red Garden Foodstuff Co., Ltd.'s

Rule 56.2 Mot. for J. upon the Agency R. 22 (June 23, 2005), ECF No. 25 ("Pl.'s Mem.");

(2) that the Department's selection of a surrogate value for fresh, raw, head-on, shell-on shrimp

was unlawful, *id.* at 35; (3) that the Department's selection of a surrogate value for shrimp feed

was unlawful, *id.* at 52; (4) that the Department's selection of surrogate financial ratios was

unlawful, *id.* at 54; (5) that Commerce unlawfully used inaccurate production volume data for

---

[1] The scope of the investigation ("subject merchandise") was originally defined as "certain warmwater shrimp and prawns, whether frozen or canned, wild-caught (ocean harvested) or farm raised (produced by aquaculture), headon or head-off, shell-on or peeled, tailon or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen or canned form."  *Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen & Canned Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 70,997, 71,000 (Dec. 8, 2004).  The scope of the antidumping duty order excluded "canned warmwater shrimp and prawns" due to a finding by the U.S. International Trade Commission that "a domestic industry in the United States is not materially injured or threatened with material injury by reason of imports of canned warmwater shrimp and prawns from the PRC."  *Notice of Amended Final Determination of Sales at Less Than Fair Value & Antidumping Duty Order: Certain Frozen Warmwater Shrimp from the People's Republic of China*, 70 Fed. Reg. 5,149, 5,150 (Feb. 1, 2005).

one of Red Garden's suppliers despite the presence of accurate data on the record, *id.* at 57;

(6) that the Department's selection of a surrogate value for labor expenses was unlawful, *id.*

at 49; and (7) that Commerce unlawfully refused to allow Red Garden to correct a miscalculation

submitted prior to verification, *id.* at 59-59.  Defendant requests a voluntary remand as to the

final two claims but opposes plaintiff's position on each of the other claims.  Def.'s Mem. in

Resp. to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. (Sept. 26, 2005), ECF No. 35 ("Def.'s

Resp.").

       The court concludes that Commerce erred in applying an adverse inference when

selecting from among the facts otherwise available to determine factors of production for certain

of Red Garden's sales, that Commerce must reconsider its determination of the surrogate value

for fresh, raw, head-on, shell-on shrimp, that plaintiff is not entitled to relief on its challenges to

the surrogate value of shrimp feed and the surrogate financial ratios, and that Commerce must

recalculate Red Garden's margin using correct production volume for a certain Red Garden

supplier.  On the issues for which defendant requests a voluntary remand, the court will direct

Commerce to redetermine the valuation of labor expenses and to reconsider the decision not to

incorporate certain corrected data.

## I. BACKGROUND

       After initiating the antidumping investigation of Chinese exports of subject merchandise,

Commerce selected four "mandatory respondents,"[2] Allied Pacific Group ("Allied Pacific"),

---

       [2] "Mandatory respondents" receive margins based on their own sales when Commerce examines fewer than all respondents in the review.  The Department has limited authority to decline to examine each respondent pursuant to section 777A(c)(2) of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1677f-1(c)(2) (2000).

Yelin, Zhanjian Guolian Aquatic Products Co., Ltd ("Guolian"), and Red Garden.[3]  *Notice of*

*Initiation of Antidumping Duty Investigations: Certain Frozen & Canned Warmwater Shrimp*

*From Brazil, Ecuador, India, Thailand, the People's Republic of China & the Socialist Republic*

*of Vietnam*, 69 Fed. Reg. 3,876 (Jan. 27, 2004) ("*Initiation Notice*"); *Notice of Prelim.*

*Determination of Sales at Less Than Fair Value, Partial Affirmative Prelim. Determination of*

*Critical Circumstances & Postponement of Final Determination: Certain Frozen & Canned*

*Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 42,654, 42,656 (Jul. 16,

2004) ("*Prelim. Determination*").  In the preliminary determination issued in this investigation

("Preliminary Determination") Commerce found that goods were being sold in the United States

at less than fair value and assigned Red Garden a preliminary weighted-average dumping margin

of 7.67%.  *Prelim. Determination*, 69 Fed. Reg. at 42,654 & 42,671.[4]  The Final Determination

assigned Red Garden a weighted-average dumping margin of 27.89%.  *Final Determination*, 69

Fed. Reg. at 71,003.  Commerce then issued an Amended Final Determination that responded to

ministerial error allegations but left Red Garden's margin unchanged.  *Amended Final*

*Determination*, 70 Fed. Reg. at 5,151.

---

[3] The International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") also conducted parallel investigations of exports from Brazil, Ecuador, India, Thailand and the Socialist Republic of Vietnam.  *Notice of Initiation of Antidumping Duty Investigations: Certain Frozen & Canned Warmwater Shrimp From Brazil, Ecuador, India, Thailand, the People's Republic of China & the Socialist Republic of Vietnam*, 69 Fed. Reg. 3,876, 3,876 (Jan. 27, 2004).

[4] The Department published an amendment to its preliminary determination that did not affect this action.  *Notice of Amended Prelim. Antidumping Duty Determination of Sales at Less Than Fair Value: Certain Frozen & Canned Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 53,409 (Sept. 1, 2004).

Plaintiff initiated this action by filing its summons on February 2, 2005 and its complaint on March 1, 2005.  Summons (Feb. 2, 2005), ECF No. 1; Compl.  On June 22, 2005, plaintiff moved for judgment on the agency record under USCIT Rule 56.2 and filed a memorandum in support of its motion.  Pl.'s Mem.  The court heard oral argument on January 11, 2006. Subsequently, the parties filed supplemental briefs addressing specific questions from the court. *Letter from Red Garden to the Ct.* (Mar. 3, 2006), ECF No. 46; Def.'s Supplemental Br. in Resp. to the Ct.'s Questions of Jan. 31, 2006 (Mar. 3, 2006), ECF No. 47.

On February 14, 2007, the court stayed this action pending a final decision in the related case *Allied Pacific Food (Dalian) Co. v. United States* (Consol. Court No. 05-00056).  Order (Feb. 14, 2007), ECF No. 50.  This stay was lifted by the final decision in that case, which was issued on July 29, 2010.  *Allied Pacific Food (Dalian) Co. v. United States*, 34 CIT __, 716 F. Supp. 2d 1339 (2010).  The court conducted a telephone conference with the parties in July 2011 to address questions that had arisen on various matters, including the questions of whether additional submissions were appropriate pertaining to defendant's request for a voluntary remand on redetermining a surrogate labor rate and the wording that would be appropriate for a remand order addressing that redetermination.  The conference concluded in the concurrence of all parties that the court should consider the case to be under submission.

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980 ("Customs Courts Act"), 28 U.S.C. 1581(c) (2000), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a (2000), including an action contesting a final determination of sales at less than fair value that

Commerce issues under section 735 of the Tariff Act, 19 U.S.C. § 1673d(a).  The court will

uphold the Department's findings, conclusions, and determinations unless they are unsupported

by substantial evidence on the record or otherwise not in accordance with law.  *Id.*

§ 1516a(b)(1)(B)(i).

A.  For Red Garden's Sales of Merchandise from a Certain Supplier, Commerce Unlawfully
Used an Adverse Inference in Selecting from Among the Facts Otherwise Available

Commerce ordinarily determines the normal value of subject merchandise of an exporter

or producer from a non-market economy ("NME") country "on the basis of the value of the

factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1).  For a

non-producing exporter, Commerce typically will determine normal value using the factors of

production ("FOPs") pertaining to the exporter's suppliers.  *See id.* § 1677(28).  Because Red

Garden was not a producer during the POI and instead was an exporter of subject merchandise

produced by others, Commerce required Red Garden to weight-average the factors of production

of its various shrimp-producing suppliers using a database consisting of the FOP data of each

supplier.  For this purpose, Commerce directed Red Garden to obtain completed Section D

("Factors of Production") questionnaires from each supplier.

Three of Red Garden's suppliers did not provide Red Garden with completed Section D

questionnaires.  Commerce accepted Red Garden's explanation that two of those suppliers, each

of which supplied only a negligible portion of Red Garden's subject merchandise, each had

informed Red Garden that due to size and limited administrative staff it could not provide the

information requested.  The third noncomplying supplier, Meizhou Aquatic Products Quick-

Frozen Industry Co., Ltd. ("Meizhou"), which also was a party in the investigation, had supplied

Red Garden more than a negligible quantity of subject merchandise during the POI.  Meizhou

informed Red Garden that, due to the company's having changed hands and due to a shareholder

dispute, Meizhou could not provide the completed Section D response because Meizhou's

former owners had removed books and records necessary for preparation of that response.

Invoking its authority under section 776 of the Tariff Act, 19 U.S.C. § 1677e, Commerce,

concluding that Red Garden failed to cooperate by not acting to the best of its ability to comply

with the information request, decided to assign as facts otherwise available, and with an adverse

inference, a margin of 112.81%, which it described as the "PRC-wide rate," to all of Red

Garden's sales of subject merchandise supplied by Meizhou.  *Final Determination*, 69 Fed. Reg.

at 71,002-03.  Commerce based its decision to use an adverse inference on findings that Red

Garden, after being informed by the current Meizhou ownership that the former owners had

removed the necessary records, did not contact or attempt to contact Meizhou's former owners.

Issues & Decision Mem., A-570-893, at 26-27 (Nov. 29, 2004) (Admin. R. Doc. No. 1126)

("*Decision Mem.*")

        Plaintiff claims that the use of an adverse inference was contrary to law on the grounds

that: (1) the Department failed to give Red Garden proper notice that it would use an adverse

inference, Pl.'s Mem. 22-25; (2) contrary to the Department's finding, Red Garden did all it

could to comply with the request for Meizhou's FOP information, *id.* at 26-29; (3) any further

efforts by Red Garden to obtain the Section D response from Meizhou would have been futile,

*id.* at 29-31; and (4) Commerce improperly refused to accept affidavits Red Garden submitted

with ministerial error allegations establishing Red Garden's attempts to contact the former

owners of Meizhou, *id.* at 31-32.

The court concludes that Commerce, on this record, was justified in using "facts otherwise available" but that the record lacks substantial evidence to support the finding of a failure to cooperate upon which Commerce drew an adverse inference.

### 1.  Commerce Was Justified in Resorting to "Facts Otherwise Available"

Under section 776(a)(2) of the Tariff Act, 19 U.S.C. § 1677e(a)(2), Commerce is directed generally to use facts otherwise available "in reaching the applicable determination under this subtitle" if an interested party "withholds information" that Commerce has requested or "provides such information but the information cannot be verified as provided in section 1677m(i) of this title [title 19]."  19 U.S.C. § 1677e(a)(2)(A), (D).  In the Final Determination, Commerce found as facts that "Red Garden withheld information that had been requested by the Department and provided unverifiable information."  *Final Determination*, 69 Fed. Reg. at 71,002.  Commerce based these findings on what it considered to be an inconsistency between information Meizhou's ownership provided at Meizhou's verification and an exhibit to Red Garden's August 5, 2004 questionnaire response.  *Id.* (citing *Letter from Red Garden to the Sec'y of Commerce* exhibit 1 (Aug. 5, 2004) (Admin. R. Doc. No. 960) ("*Aug. 5 Questionnaire Resp.*")).  The two findings Commerce made under § 1677e(a)(2) are unsupported by record evidence.  First, despite what Commerce alleges as an inconsistency, there is no record evidence that Red Garden ever possessed the Meizhou FOP data that Commerce sought.  Red Garden could not have withheld information it did not possess.  Second, with respect to the issues surrounding the Meizhou FOP data, Commerce failed to identify what, if any, information Red Garden provided that was "unverifiable."  If Commerce was referring to the Meizhou FOP data, the finding would be invalid because the information was never submitted.

The two findings, although plainly wrong, are harmless errors.  In an "Issues and

Decision Memorandum" incorporated by reference into the Final Determination ("Decision

Memorandum"), the Department stated that it "finds applying facts available is warranted for the

portion of Red Garden's sales produced by Meizhou because Red Garden failed to provide the

FOP data that the Department had requested."  *Decision Mem.* 26-27.  Under section 776(a)(1)

of the Tariff Act, Commerce is directed to use facts otherwise available where, as here,

"necessary information is not available on the record."  19 U.S.C. § 1677e(a)(1).  Commerce was

authorized to use facts otherwise available to substitute for the missing FOP information.

   2.  Substantial Evidence Does Not Support the Finding that Red Garden Failed to Cooperate by
       Not Acting to the Best of its Ability to Comply with the Department's Information Request

In both the Final Determination and the Decision Memorandum, Commerce stated its

finding that Red Garden, for purposes of 19 U.S.C. § 1677e(b), had failed to cooperate by not

acting to the best of its ability to comply with the request for the Meizhou FOP data.  *Final*

*Determination*, 69 Fed. Reg. at 71,002; *Decision Mem.* 26-27.  In support of its ultimate finding

of a failure to cooperate, Commerce relied on a subordinate factual finding that it modified upon

issuing the Amended Final Determination, in response to a ministerial error allegation by Red

Garden.  The finding that Commerce modified was contained in the second sentence of the

following text from the Final Determination:

> During the time period that Meizhou completed its own responses, company
> officials had access to the records needed by Red Garden. . . .  Thus, we find that
> Red Garden, despite its information to the contrary, by not contacting current
> ownership of Meizhou, or the ownership that was in place when Red Garden was
> responding to the Department's questionnaires, did not act to the best of its ability
> to obtain the FOP information from Meizhou.

*Final Determination*, 69 Fed. Reg. at 71,002 (citing *Mem. from Import Compliance Specialist to the File* 2 (Sept. 22, 2004) (Admin. R. Doc. No. 1012) ("*Meizhou Verification Rept.*")).  In a memorandum that responded to the ministerial error allegation, which Commerce referenced in the Amended Final Determination, Commerce conceded that it had "incorrectly stated that Red Garden did not contact the current ownership" and recognized that there were "several instances where Red Garden contacted the current ownership."  *Mem. from Case Analysts to Office Dir., AD/CVD Enforcement Office 9*, at 12-13 (Feb. 1, 2005) (Admin. R. Doc. No. 1178) ("*Resp. to Ministerial Error Claims*").  In that memorandum, Commerce restated as follows the second sentence from the Final Determination that is quoted above:

> Thus, we find that Red Garden, despite its information to the contrary, by not contacting the former ownership of Meizhou after the current ownership notified Red Garden that it did not have the FOP information requested by Red Garden, did not act to the best of its ability to obtain the FOP information from Meizhou.

*Id.* at 12.  The memorandum further stated that "[we] continue to find that Red Garden did not cooperate to the best of its ability in obtaining Meizhou's FOP information as it did not contact Meizhou's previous ownership after it was informed as early as March 5, 2004, that the new owners did not have the requested FOP information."  *Id.* at 13-14.  In responding to the ministerial error allegations, Commerce did not withdraw or alter a finding it had made in the Decision Memorandum, which was that "[t]here is no information on the record demonstrating Red Garden's attempt to contact the former owners, even after Meizhou's current owners repeated their notification to Red Garden that the former owners possessed the information." *Decision Mem.* 26-27 (citing *Aug. 5 Questionnaire Resp*. exhibit 1; *Meizhou Verification Rept.* 2.)  Summarizing the finding, the Decision Memorandum states that "[t]hus, we find that Red Garden did not act to the best of its ability to obtain the FOP information from Meizhou

because Red Garden knew that Meizhou's former owners possessed the relevant information and

Red Garden did not provide any evidence of its attempts to obtain that information from the

former ownership." *Id.* at 27.

The statute authorizes Commerce to use an adverse inference if an interested party fails

to "cooperate by not acting to the best of its ability to comply with *a request for information*

*from the administering authority . . . ."* 19 U.S.C. § 1677e(b) (emphasis added).  After analyzing

the relevant record documents, and in particular the Department's questionnaires and Red

Garden's responses, the court concludes that the Department erred when it decided to use an

adverse inference.  In the Decision Memorandum, the Final Determination, and the Amended

Final Determination, Commerce construed its "request[s] for information," 19 U.S.C.

§ 1677e(b), differently than those requests actually were communicated to Red Garden.  When

the Section D questionnaire and three supplemental questionnaires Commerce submitted to Red

Garden are read together, these documents reveal that the requests for information were more

limited than Commerce later assumed.  As discussed in further detail below, the questionnaires

charged Red Garden with the specific tasks of sending Section D of the Department's initial

questionnaire to Meizhou, attempting to convince Meizhou to complete that questionnaire with

Meizhou's verifiable FOP data, and weight-averaging Meizhou's FOP data with FOP data of

other producers in a revised Section D database.  The various questionnaires never directed Red

Garden to obtain or attempt to obtain business records, or information in business records, from

the previous owners or from any party other than Meizhou.

The record reveals that the Department identified the issue of Red Garden's contacting

Meizhou's former owners only in hindsight, not during the questionnaire process.  Commerce

knew on June 8, 2004 that verifiable data for Meizhou's factors of production were in the hands

of Meizhou's former owners and not available to Meizhou.  Even so, Commerce still was

focusing on Meizhou's completing the Section D questionnaire seven weeks later, stating in its

third and final supplemental questionnaire that it had taken it upon itself to "put Meizhou on

notice that it must provide verifiable factors of production to Red Garden's counsel, such that

you may weight-average those factors per CONNUM [*i.e.*, individual "control number"] in a

revised Section D database."  *Letter from Program Manager to Red Garden* 1 (Jul. 26, 2004)

(Admin. R. Doc. No. 806) ("*Third Supplemental Questionnaire*").  The same supplemental

questionnaire directed Red Garden to "provide the revised database in response to this

questionnaire" and to "explain Red Garden's efforts and attempts to persuade Meizhou to

respond to the Section D Questionnaire."

Because of the way Commerce defined its information requests, Commerce could not

lawfully use an adverse inference under § 1677e(b) based on its irrelevant finding that Red

Garden, in responding to those requests, did not attempt to contact the previous owners of

Meizhou after Red Garden was informed that the new owners lacked the FOP information.  The

record does not support a finding that Red Garden failed to act to the best of its ability to comply

with the information requests in the form in which Commerce actually communicated those

requests.  The court concludes, therefore, that the application of the PRC-wide rate to the

merchandise Meizhou supplied Red Garden was unlawful.  Below, the court reviews the relevant

documents from the record and addresses the arguments defendant makes in support of the

Department's decision.

The record shows that Commerce sent to Red Garden Sections C ("Sales to the United States"), D ("Factors of Production"), and E ("Cost of Further Manufacturing or Assembly Performed in the United States") of its "antidumping duty NME questionnaire" with a cover letter dated March 1, 2004. *Letter from Program Manager to Red Garden* 1 (Mar. 1, 2004) (Admin. R. Doc. No. 121) ("*Section D Questionnaire*"). Section D, the section of the questionnaire at issue here, is directed almost entirely to the submission of factor-of-production information of producers of subject merchandise. For a non-producing trading company such as Red Garden, the pertinent instruction in the Section D questionnaire, contained in part I ("General Explanation of Section D") is as follows: "If your company did not produce the subject merchandise, we request that this section be immediately forwarded to the company that produces the subject merchandise and supplies it to you or to your customers." *Id.* at D-2.

In responding to the March 1 questionnaire, Red Garden reported FOP information for two major suppliers,[5] "Mingfeng" and "Longfeng," and also informed Commerce that three other suppliers, Meizhou, "Hengchang," and "Longfa," did not provide Red Garden FOP data. *Letter from Red Garden to the Sec'y of Commerce* D-1-D-2 (Apr. 21, 2004) (Admin. R. Doc. No. 308) ("*Apr. 21 Questionnaire Resp.*").[6] Red Garden stated that Meizhou "did not cooperate with Red Garden to provide its FOP data," and Red Garden requested, "given the minuscule amount of

---

[5] The two suppliers Shantou Red Garden Foodstuff Co., Ltd. ("Red Garden") identified as its major suppliers were Shantou Jinyng District Mingfeng Quick-Frozen Factory ("Mingfeng") and Shantou Longfeng Foodstuffs Co., Ltd. ("Longfeng"). *Letter from Red Garden to the Sec'y of Commerce* D-1 (Apr. 21, 2004) (Admin. R. Doc. No. 308) ("*Apr. 21 Questionnaire Resp.*").

[6] The two suppliers Red Garden identified as "minuscule" suppliers were Chaoyang Jindu Hengchang Aquatic Products Enterprise Co., Ltd. ("Hengchang") and Raoping County Longfa Seafoods Co., Ltd. ("Longfa"). *Apr. 21 Questionnaire Resp.* D-2.

supply from Hengchang and Longfa, that the Department not require the factors of production

for these companies." *Id.*

Commerce sent Red Garden's counsel a supplemental questionnaire ("First Supplemental

Questionnaire") with a cover letter dated May 17, 2004, in which Commerce noted "numerous

serious deficiencies in your Section C and D questionnaire." *Letter from Program Manager to*

*Red Garden* 1 (May 17, 2004) (Admin. R. Doc. No. 351) ("*First Supplemental Questionnaire*").

Two paragraphs in the "Section D" portion of the supplemental questionnaire, numbered as

paragraphs 1 and 4, are relevant to Red Garden's claim challenging the Department's use of an

adverse inference.  Paragraph 1, after noting that Red Garden stated that it did not provide

factors of production from certain suppliers, requested that Red Garden report factors of

production for the following three suppliers: Hengchang, Longfa, and Red Garden Food

Processing Co., Ltd ("RGFP").[7]  *Id.* at 10.  The paragraph concludes with the directive that "[i]f

any of these suppliers declines to provide Section D information, please clearly state so."  *Id.*

The paragraph makes no mention of Meizhou or the missing FOP information of Meizhou.  As

discussed previously, Red Garden already had identified Meizhou as a supplier that declined to

provide Section D information.

Paragraph 4 of the Section D portion of the supplemental questionnaire covers the same

topic as paragraph 1 and, like paragraph 1, mentions Hengcheng, Longfa, and RGFP but does not

---

[7] This paragraph directed that Red Garden "[p]lease report the factors of production for
Chaoyang Jindu Hengchang Aquatic Products Enterprise Co., Ltd ('Hengchang'), Raoping
County Longfa Seafoods Co., Ltd ('Longfa'), and Red Garden Food Processing Co., Ltd.
('RGFP'), regardless of whether sales from RGFP occurred during the POI."  *Letter from
Program Manager to Red Garden* 10 (May 17, 2004) (Admin. R. Doc. No. 351) ("*First
Supplemental Questionnaire*").

mention Meizhou.  *Id.* at 11.[8]  The paragraph instructs Red Garden that "[y]ou must provide

FOPs for each of Red Garden's suppliers which sold subject merchandise during the POI."

However, the entire context of paragraph 4 is confined to obtaining FOP information from

Hengcheng, Longfa, and RGFP.  *Id.*

 Read as a whole, the First Supplemental Questionnaire, which addressed the topic of

suppliers' FOP data in paragraphs 1 and 4 as discussed above, did not inform Red Garden that

the Department was dissatisfied with Red Garden's response to the Department's request for

Meizhou's Section D information on factors of production.  Instead, it directed Red Garden's

attention to the missing FOP data of Hengcheng, Longfa, and RGFP.

 Red Garden responded to the first supplemental questionnaire with a submission

Commerce received on June 8, 2004.  *Letter from Red Garden to the Sec'y of Commerce* (June 8,

2004) (Admin. R. Doc. No. 595) ("*June 8 Questionnaire Resp.*").  The June 8, 2004 response

included the FOP data for RGFP.  *Id.* exhibit SD-1.  Regarding the Hengcheng and Longfa data,

Red Garden informed Commerce in the response that both Hengcheng and Longfa declined to

provide the Section D information and that "[d]espite the best efforts by Red Garde[n] to obtain

---

 [8] The entire text of paragraph 4 is as follows:
On page D-2, you stated that Red Garden did not receive FOP information from
Hengchang or from Longfa.  Further, there is apparently no reference to the factors
of production used by RGFP during the POI.  However we note that in your
Section C database, you have reported sales with manufacturer codes [confidential
information deleted].  You must provide FOPs for each of Red Garden's suppliers
which sold subject merchandise during the POI.  Please state whether the
CONNUMs reported in your Section D database represent the factors of production
for Mingfeng and Longfeng *only*.
*First Supplemental Questionnaire* 11.

their cooperation, these companies simply find that they are too small and have such limited

administrative staffs that they cannot provide the information requested." *Id.* at 18.

Red Garden included in its June 8, 2004 response to the supplemental questionnaire

additional information on the failure of Meizhou to cooperate, even though the First

Supplemental Questionnaire did not contain a specific request that Red Garden address this

matter.  Red Garden told the Department that "even though after much effort on the part of Red

Garden to convince Meizhou to cooperate in this investigation, Meizhou finds that it simply does

not have adequate verifiable documents in the POI to satisfy the Department's requirements"

because a group of stockholders had left the company and taken with them "many of the

accounting books, including many covering the POI." *Id.*  Red Garden offered the Department

the following option: "If the Department decides that it will accept less than verifiable data,

please let Red Garden know and Meizhou will be willing to provide it." *Id.*  Red Garden

included as an exhibit a letter on Meizhou's letterhead certifying Meizhou's inability to provide

"the factors of production information required by the Department of Commerce in connection

with the response of Red Garden Food Company." *Id.* exhibit SD-9 ("In the beginning of year

2004 shareholder and their management have left our company because of disputes between our

shareholders.  They have also brought our company's files with them.  We therefore cannot trace

any original documents on our sales and costs at the moment.").

Commerce sent a second supplemental questionnaire on June 23, 2004 ("Second

Supplemental Questionnaire") that consisted of seven questions on a variety of topics.  *Letter*

*from Program Manager to Red Garden* 2 (June 23, 2004) (Admin. R. Doc. No. 662) ("*Second*

*Supplemental Questionnaire*").  Only question 2 pertained to the topic of Meizhou's FOP data.

In question 2, Commerce did not make even a general request that Red Garden attempt again to

obtain the missing Section D information of Meizhou, either from Meizhou or from the former

owners.  The question focused only on Red Garden's past attempts to obtain Meizhou's FOP

information.  Quoted in its entirety, question 2 was as follows: "Please explain what measures

you have taken to obtain Meizhou's factors of production for subject merchandise during the

POI, and provide evidence of your actions (*e.g.* copies of faxes, emails, phone records, letters,

etc.)."  *Id.*  Red Garden submitted its response to the Second Supplemental Questionnaire on

June 30, 2004, responding to question 2 as follows:

> Mr. Lin, the vice general manager of Red Garden Foodstuff Co., Ltd., called
> Meizhou numerous times and met with Meizhou several times both alone and with
> Red Garden's legal counsel and accountant to try to find ways that Meizhou could
> report verifiable data.  Due to the situation previously reported, Meizhou simply no
> longer has any verifiable data capable of meeting the Department's strict
> requirements.  There are no written records of these phone calls or meetings.
> However, as a result of such meetings and discussions, Meizhou did agree to write to
> DOC the letter submitted in our June 8, 2004 submission.

*Letter from Red Garden to the Sec'y of Commerce* 2 (June 30, 2004) (Admin. R. Doc. No. 676)

("*June 30 Questionnaire Resp.*").

In the Preliminary Determination, published July 16, 2004, Commerce stated its intention

to use facts otherwise available–specifically, FOP data from Mingfeng and Longfeng–as a

substitute for the Meizhou FOP data.  *Prelim. Determination*, 69 Fed. Reg. at 42,665-66.

Commerce made no mention in the Preliminary Determination of an intention to use an adverse

inference and, here also, expressed no discontent with Red Garden's efforts to date to obtain

Meizhou's FOP data.

Commerce sent its third and final supplemental questionnaire on July 26, 2004 ("Third

Supplemental Questionnaire").  In this questionnaire, Commerce addressed the matter of

Meizhou's FOP information as follows:

> Red Garden has previously indicated that Meizhou could not provide verifiable
> factors of production.  In the preliminary determination, we substituted Mingfeng's
> and Longfeng's factors of production to determine the normal value for sales
> produced by Meizhou.  Please attempt again to obtain Meizhou's factors of
> production.  We have put Meizhou on notice that it must provide verifiable factors of
> production to Red Garden's counsel, such that you may weight-average those factors
> per CONNUM in a revised Section D database.  Please provide the revised database
> in response to this questionnaire.  Finally, please explain Red Garden's efforts and
> attempts to persuade Meizhou to respond to the Section D Questionnaire.  In
> addition, provide the Department with all documentation regarding Red Garden's
> effor[ts] and persuasions requesting that Meizhou respond to the Department's
> Section D questionnaire (*e.g.* letters, fax logs, phone records etc.).

*Third Supplemental Questionnaire.*  Although the Department asked that Red Garden "[p]lease

attempt again to obtain Meizhou's factors of production," the context of the paragraph is Red

Garden's responsibility to use its efforts and persuasions to induce Meizhou to complete

Section D of the Department's questionnaire using Meizhou's FOP information and Red

Garden's use of that information in providing the Department a revised Section D database with

weight-averaged FOPs.  Read in that context, the topic of the paragraph is Red Garden's

endeavoring to influence Meizhou to complete Section D.  There is no general directive to seek

the business records from any person who might possess them, and the paragraph, read in

context, does not suggest that Commerce contemplated that Red Garden would do so.  To the

contrary, the paragraph suggests that Commerce fully expected that Meizhou, after receiving the

communication from Commerce, would provide the FOP information to Red Garden's counsel.

In answering the Third Supplemental Questionnaire, Red Garden stated that it had "attempted

again to obtain cooperation from Meizhou" and attached a list of the attempts to obtain

Meizhou's factors of production.  *August 5 Questionnaire Resp.* 2 & exhibit 1.[9]

      In a case brief that Commerce received on October 20, 2004, the petitioners in the

investigation urged Commerce to find that Red Garden did not act to the best of its ability in

obtaining Meizhou's FOP information because, petitioners alleged, Red Garden did not contact

the previous owners of Meizhou to seek that information.  *Letter from Petitioners to the Sec'y of

Commerce* 23-26 (Oct. 19, 2004) (Admin. R. Doc. No. 1049).  Petitioners advocated that

Commerce apply facts available with an adverse inference to all sales made by Red Garden from

subject merchandise produced by Meizhou.  *Id.*

      In summary, the court concludes, from the questionnaires considered as a whole and read

in the proper context, that the Department's information requests were that Red Garden:

(1) provide Meizhou with Section D of the Department's questionnaire; (2) use its "efforts and

persuasions" to induce Meizhou to complete that questionnaire; (3) again attempt to obtain

Meizhou's FOP information in the wake of the Department's having "put Meizhou on notice that

---

[9] The list did not include attempts to contact the former owners of Meizhou Aquatic Products Quick-Frozen Industry Co., Ltd. ("Meizhou").  Under the court's disposition of Red Garden's claim challenging the adverse inference, it is not necessary that the court consider the effect of the affidavits Red Garden submitted with its ministerial error allegation.  These affidavits, which Commerce did not admit to the record, speak of contact between Red Garden and the former owners during July 2004.  *Letter from Red Garden to the Sec'y of Commerce* exhibits 8, 12, & 13 (Dec. 8, 2004) (Admin. R. Doc. No. 1144).  Because Commerce requested on June 23, 2004 that Red Garden "explain what measures you have taken to obtain Meizhou's factors of production . . . and provide evidence of your actions," Red Garden's not having submitted in its response to this questionnaire evidence of contact with Meizhou's former owners may support an inference that Red Garden had not contacted Meizhou's former owners as of the date of that response, June 30, 2004.  *Letter from Program Manager to Red Garden* 2 (June 23, 2004) (Admin. R. Doc. No. 662) ("*Second Supplemental Questionnaire*"); *Letter from Red Garden to the Sec'y of Commerce* 2 (June 30, 2004) (Admin. R. Doc. No. 676) ("*June 30 Questionnaire Resp.*").

it must provide verifiable factors of production to Red Garden's counsel," *Third Supplemental Questionnaire* 1; and (4) using that verifiable FOP information, provide a revised Section D database with weight-averaged FOPs, in response to the Third Supplemental Questionnaire, *id.* The record does not contain substantial evidence that Red Garden failed to cooperate by not acting to the best of its ability to comply with these information requests.

Defendant attempts to support the Department's decision to use an adverse inference by raising several arguments. Defendant argues, *inter alia*, that Red Garden did not meet the "best of its ability" standard in complying with the Department's requests for Meizhou's FOP data because Red Garden did not, as required by the decision of the U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") in *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003), "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Def.'s Resp. 20-25. Defendant asserts, specifically, that after Red Garden told Commerce in Red Garden's Section D response that Meizhou did not cooperate with Red Garden to provide the FOP data, "Commerce subsequently issued a supplemental questionnaire notifying Red Garden of its deficiency and instructing that Red Garden 'must provide' factors of production for its suppliers who sold subject merchandise during the period of investigation." *Id.* at 21 (citing *First Supplemental Questionnaire* 11). Defendant's argument mischaracterizes the relevant language in the Department's First Supplemental Questionnaire. As the court discussed previously, the language cited by defendant, which was contained in the aforementioned paragraph 4, did not inform Red Garden that Commerce was dissatisfied with the efforts Red Garden had made up to that time in responding to the request for Meizhou's Section D information. Defendant would have the court

conclude, erroneously, that in the First Supplemental Questionnaire Commerce notified Red

Garden "of its deficiency" as to the Meizhou FOP data.  *Id.* at 21.  To the contrary, the First

Supplemental Questionnaire directed Red Garden's attention to the missing FOP data of

Hengcheng, Longfa, and RGFP.  Defendant has quoted out of context a sentence that, when read

in the proper context, did not refer to Meizhou's FOP information.

Defendant also argues that Commerce was justified in using an adverse inference

because, in responding to the Second Supplemental Questionnaire, "Red Garden provided no

documentation" to support the recollections that its vice general manager had of communications

with Meizhou.  *Id.* at 23.  This argument is directed to an irrelevant point.  In issuing the

Amended Final Determination, Commerce revised the Final Determination to base its adverse

inference on the finding that Red Garden failed to contact Meizhou's former owners.

Defendant's argument overlooks the critical record fact that Commerce reversed the finding,

which had been stated in the Final Determination, that Red Garden had not contacted the present

ownership of Meizhou.  Replacing that finding with a finding that Red Garden had made a

number of such contacts, Commerce shifted its focus to the topic of contacts with the former

owners.

Defendant also emphasizes that Commerce, at Meizhou's verification, found "that,

contrary to Red Garden's assertions, there was a period of time, overlapping with the time Red

Garden was completing its questionnaire responses, when employees at Meizhou did have access

to the required information."  *Id.* at 23 (citing *Meizhou Verification Report* 2).  Regardless of

whether the cited finding is correct, that finding cannot support the use of an adverse inference

on the record of this case.  As the court concluded previously, the record does not support a

finding that Red Garden failed to cooperate by not acting to the best of its ability to comply with

the information requests as those requests were communicated in the questionnaires.

In addressing plaintiff's argument that the Department's actions were inconsistent with

19 U.S.C. § 1677m(d), defendant argues, further, that the Third Supplemental Questionnaire

"again instructed Red Garden to attempt to obtain the data and again asked for documentary

proof of its efforts" and that "[t]hus, Commerce plainly notified Red Garden that it was

unsatisfied with Red Garden's previous efforts."[10]  Def.'s Resp. 26 (citing *Third Supplemental

Questionnaire* 1).  Here again, defendant mischaracterizes a record document.  The Third

Supplemental Questionnaire, as the court discussed previously, asked Red Garden to document

Red Garden's efforts to get Meizhou to complete the Section D questionnaire.  Although the

relevant paragraph contained the sentence, "[p]lease attempt again to obtain Meizhou's factors of

production," the context was Red Garden's using its efforts and persuasions to have Meizhou fill

out Section D.  Nothing in the Third Supplemental Questionnaire or any of the other

questionnaires communicated an expectation that Red Garden would attempt to obtain business

records from the former owners.  Knowing of the situation involving the former owners as of

June 8, 2004, Commerce had multiple opportunities to communicate such an expectation to Red

Garden but never did so.

Finally, the court concludes that defendant's reliance on *Nippon Steel Corp.* is misplaced.

Nothing in the holding of *Nippon Steel Corp.* excuses Commerce from the obligation to ensure

---

[10] Because the court concludes that the record fails to support a finding that Red Garden
did not act to the best of its ability to comply with the relevant information requests as those
requests were communicated, the court does not reach plaintiff's argument based on 19 U.S.C.
§ 1677m(d).

that any findings made under 19 U.S.C. § 1677e(b) are grounded in the language Commerce

chose to communicate its information requests to an interested party.

In the circumstances disclosed by the record information considered as a whole, and

specifically the questionnaires and responses, Commerce was not justified in using an adverse

inference in selecting from among the facts otherwise available as substitutes for the Meizhou

FOP data.  On remand, Commerce must redetermine the rate it applied to Red Garden's sales of

subject merchandise obtained from Meizhou and may not use an adverse inference.

### B.  Commerce Must Reconsider its Choice of Surrogate Value for Shrimp

Commerce valued fresh, raw, head-on, shell-on shrimp at $5.97 per kilogram using a

value derived from the financial statement of an Indian seafood processor, Nekkanti Sea Foods

Ltd. ("Nekkanti") for the period April 2002 through March 2003.  *Prelim. Determination*, 69

Fed. Reg. at 42,668; *Mem. from Case Analyst to the File* 3 (Nov. 29, 2004) (Admin. R. Doc.

No. 1118) ("*Red Garden Analysis Mem.*") (indicating no change from Preliminary

Determination).  Commerce chose this value over four other data sets on the administrative

record: (1) data compiled by the Seafood Exporters' Association of India ("SEAI") pertaining to

the price of head-on shell-on shrimp in two regions of India during the POI;[11] (2) the results of

surveys of Indian shrimp processors compiled by the Aquaculture Certification Council ("ACC")

pertaining to the price of head-on shell-on shrimp in India during the POI; (3) data from two

Indian shrimp processors, Nekkanti and Devi Sea Foods, Ltd. ("Devi"), compiled for a parallel

antidumping investigation pertaining to the price of head-on shell-on shrimp during the POI; and

---

[11] According to other respondents, the Seafood Exporters Association of India "is the organization that represents Indian exporters and processors of shrimp and has offices in the main shrimp producing regions of India."  *Letter from Allied Pacific & Yelin to Sec'y of Commerce* 3-4 (May 21, 2004) (Admin. R. Doc. No. 356) ("*SEAI Data*").

(4) data from the government of Ecuador pertaining to the price of head-on shell-on shrimp

during the POI. *Decision Mem.* 12-13; *Prelim. Determination*, 69 Fed. Reg. at 42,667-68.

When determining normal value using factors of production, Commerce must use the

"best available information regarding the values of such factors in a market economy country or

countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1).

The best available information, according to the Department's policy as described in the

Decision Memorandum, is information reflecting "review period-wide price averages, prices

specific to the input in question, prices that are net of taxes and import duties, prices that are

contemporaneous with the period of investigation or review, and publicly available data."

*Decision Mem.* 14 (emphasis omitted).

The SEAI prices were contained in several documents on the record, prepared by the

SEAI. *Prelim. Determination*, 69 Fed. Reg. at 42,668; *Letter from Allied Pacific & Yelin to

Sec'y of Commerce* 3-4, exhibit 3 (May 21, 2004) (Admin. R. Doc. No. 356) ("*SEAI Data*").

Four of these documents were "Circulars" showing the price of head-on shell-on shrimp in one

of India's shrimp producing regions, Andrha Pradesh, on specific dates during the POI. Another

document was untitled and showed the average prices of shrimp in another of India's shrimp

producing regions, Tamil Nadu, during each month of the POI. *SEAI Data.* Commerce cited

five concerns in rejecting the SEAI data: that these data were not publicly available, that the data

on Andhra Pradesh were not sufficiently contemporaneous with the POI because they represent

prices from only four dates, that "it is unclear as to how the average was derived" for the Tamil

Nadu data, that the SEAI data were reported using weight measurements different from those

used in the data reported by respondents, and that the record did not make clear the extent to

which the data on these two regions were representative of India.  *Prelim. Determination*, 69

Fed. Reg. at 42,668.  Regarding the last concern, Commerce noted that information it obtained

directly from the SEAI indicated that Andhra Pradesh and Tamil Nadu accounted for 10-11% of

India's shrimp purchases, a percentage that disagreed with statements by the respondents that

submitted the SEAI data that these two regions accounted for more than 55% of India's shrimp

purchases.  *Id.*

Commerce also rejected the ACC data, which consisted of a table showing "average

monthly farm gate price data for raw, whole, unprocessed black tiger shrimp based on weekly

purchase invoices of packers in the states of Andhra Pradesh and Tamilnadu" during each month

of 2003.  *Letter from Allied Pacific & Yelin to the Sec'y of Commerce* exhibit 3 (Sept. 8, 2004)

(Admin. R. Doc. No. 982) ("*ACC Data*").  Commerce based its rejection on its finding that the

ACC was "not sufficiently insulated from conflict of interest."  *Decision Mem.* 13.  Although

Commerce stated no findings of fact in support of this rejection, it apparently found persuasive

the petitioners' argument that a conflict of interest existed because the "the membership and

leadership of the ACC is composed of interests adverse to the Petitioners in the instant

proceeding," as the ACC was "founded by and shares members, directors, officers, and its U.S.

location with the Global Aquacultural Alliance, some of whose members are subject to the

Department's companion investigations."  *Id.* at 10.

The third alternative data set rejected by Commerce consisted of "quantity and value data

for the POI for raw shrimp purchases of Nekkanti and Devi, two respondents in the companion

Indian investigation, that have been ranged for public release."  *Id.* at 13.[12]  The Department

---

[12] The Department's regulations require parties to provide a public summary of business

(continued...)

rejected these data (the "ranged Nekkanti/Devi data") because "the record of this proceeding

does not indicate how the data was ranged," so that "[if] the Department were to rely on the data

from Nekkanti and Devi, it may be relying on figures that deviate substantially from the actual

data." *Id.* at 13-14.

The fourth alternative data set rejected by Commerce showed prices for exports of head-

on shell-on shrimp from Ecuador during the POI. *Id.* at 13. Commerce acknowledged that the

"Ecuadorean data [were] obtained by requesting the data from the Ecuadorean Central Bank"

and that the official who provided these data stated that this "information is already publicly

available, but we hope to have them up in our website soon for public viewing . . . ." *Id.* at 15

(internal quotation omitted). Commerce nevertheless rejected the Ecuadorean data, stating that

they were "not a reliable source for valuing the Respondents' raw shrimp input because they are

not publicly available, consistent with the Department's long-established practice regarding the

selection of surrogate values." *Id.* at 14 (citing 19 C.F.R. § 351.408(c)(1)). Commerce stated

that it "cannot consider this [*sic*] data publicly available, as it is not available to the public

without making a specific request to the Central Bank of Ecuador, who ultimately determine

whether to provide the data to the public." *Id.* at 15.

Red Garden argues that Commerce inadequately explained the conclusion that the

Nekkanti financial statement data were the best available information relative to other record

data and, specifically, relative to the Ecuadorean export data, Pl.'s Mem. 36-42, unlawfully

failed to adjust the price reflected by the Nekkanti financial statement to remove purchases of

---

[12](...continued)

proprietary information and specify that "[g]enerally, numerical data will be considered
adequately summarized if grouped or presented in terms of indices or figures within 10 percent
of the actual figure." 19 C.F.R. § 351.304(c) (2003).

products other than head-on shell-on shrimp, *id.* at 44-47, and unlawfully refused to calculate

count-size specific surrogate values for the purchases of Red Garden's suppliers, *id.* at 44.[13]

Red Garden is justified in objecting that Commerce failed to adjust the price reflected by

the Nekkanti financial statement to remove purchases of products other than head-on shell-on

shrimp.  In *Allied Pacific Food (Dalian) Co. v. United States*, 30 CIT __, 435 F. Supp. 2d 1295

(2006), the Court of International Trade resolved claims brought by two other respondents in this

investigation that pertained to the same administrative record.  In *Allied Pacific*, the court held

unlawful the Department's using the price reflected by the Nekkanti financial statement as the

basis for the surrogate value of head-on shell-on shrimp for the plaintiffs in that case.  *Id.* at __,

435 F. Supp. 2d at 1309.  The court noted the Department's failing to explain how the Nekkanti

financial statement data were superior to the other record information and the Department's

relying on several unlawful findings.  *Id.* at __, 435 F. Supp. 2d at 1309.  Among the unlawful

findings was that the Nekkanti financial statement data referred exclusively to purchases of raw

head-on shell-on shrimp.  *Id.* at __, 435 F. Supp. 2d at 1311.  The Department relied on the same

unlawful finding in using the Nekkanti financial statement data to value the raw shrimp input of

Red Garden's suppliers.

---

[13] "Count-size" is a method of measuring the average size of shrimp by determining how many shrimp on average would constitute a given weight.  *Letter from Allied Pacific & Yelin to Sec'y of Commerce* 1 (May 21, 2004) (Admin. R. Doc. No. 356).  Defendant erroneously argues that Commerce used count-size specific surrogate values for Red Garden's suppliers.  Def.'s Mem. in Resp. to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. 29 (Sept. 26, 2005), ECF No. 35 ("Def.'s Resp.") ("Commerce valued the raw shrimp input using a count size methodology that relied upon . . . a *combination* of three sources of data . . .").  Red Garden also argues that the Department improperly used certain data, the "Urner Barry data," to create count-size specific surrogate values for respondents other than Red Garden.  Mem. in Supp. of Pl. Shantou Red Garden Foodstuff Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency R. 42-44 (June 23, 2005), ECF No. 25 ("Pl.'s Mem.").  As Red Garden has no standing to raise this objection, the court does not reach these arguments.

Commerce obtained the $5.97-per-kilogram surrogate value from a heading in a table in

Nekkanti's financial statement, "Raw Material Consumed for Processing." *Mem. from Case*

*Analyst to the File* exhibit 3 (Jul. 2, 2004) (Admin. R. Doc. No. 692) ("*Prelim. Factor Valuation*

*Mem.*"). An excerpt from Nekkanti's questionnaire response in the parallel investigation on

Indian exports states that "[w]hile many raw material purchases were of headless shell on raw

shrimp, certain purchases were of head on shrimp or peeled and undeveined." *Letter from Allied*

*Pacific & Yelin to the Sec'y of Commerce* 700 (Sept. 8, 2004) (Admin. R. Doc. No. 982)

("*Nekkanti's Questionnaire Resp.*"). Nekkanti also submitted quantitative data in the companion

investigation showing substantial purchases of partially-processed shrimp. *Id.* at 1553

(exhibit SD-3).

The court concludes that substantial evidence did not support the Department's finding

that the heading in the Nekkanti financial statement, "Raw Material Consumed for Processing,"

referred only to head-on shell-on shrimp. As the court explained in *Allied Pacific*, the "record

evidence instead establishes that some of Nekkanti's purchases were of shrimp that had been

partially processed." 30 CIT at __, 435 F. Supp. 2d at 1311; *Nekkanti's Questionnaire Resp.* 700

(indicating that Nekkanti purchased, in part, partially processed shrimp); *id.* at 1553 (quantitative

data showing purchases of partially-processed shrimp). After the remand ordered in *Allied*

*Pacific*, Commerce agreed that the Nekkanti financial statement was not limited to purchases of

head-on shell-on shrimp and attempted to adjust the price reflected by the Nekkanti financial

statement to remove distortions to the price caused by the processed shrimp, which are typically

more expensive than head-on shell-on shrimp. *Allied Pacific Food (Dalian) Co. v. United*

*States*, 32 CIT __, __, 587 F. Supp. 2d 1330, 1337 (2008) ("*Allied II*") ("Commerce explained

that 'upon careful re-examination, we agree with the Court's observation that this value includes

processed shrimp.'").  The court must reject the Department's choice of a surrogate value that

rests on an invalid finding, the more so where, as here, that finding is fundamental to the identity

of the merchandise being valued and alternatives existed on the record that did not suffer from

this critical flaw.

The Department's error with respect to processed shrimp contained within the Nekkanti

financial statement data undermines its ultimate finding that these data were the best available

data, such that this ultimate finding lacks support in the record.  The Department rejected each

alternative data set on the record as not meeting one or more of the Department's criteria.

However, the Nekkanti financial statement data fail to satisfy two of those criteria.  Because

these data were not confined to raw head-on shell-on shrimp, they were not specific to the input

in question.  Nor were they contemporaneous: the Nekkanti financial statement covered the

twelve-month period immediately preceding the POI.

As an example of the flaws in the Department's comparisons, the court notes that the

Department rejected the SEAI data in part because it found these data insufficiently

contemporaneous with the POI, even though the SEAI data from the Tamil Nadu region were

fully contemporaneous with the POI and the data from the Andhra Pradesh region pertained to

four dates during the POI (June 6, 2003, June 21, 2003, July 26, 2003, and August 9, 2003).

*Decision Mem.* 13-14.  As a second example, Commerce rejected the ranged Nekkanti/Devi data

because the method by which these data were ranged was unknown.  *Decision Mem.* 13-14.  That

objection does not "support a conclusion that the surrogate values derived from the inherently

flawed Nekkanti financial statement data are superior . . . ."  *Allied Pacific*, 30 CIT at __, 435 F.

Supp. 2d at 1322.  The ranged Nekkanti/Devi data satisfy at least some of the Department's

criteria for choosing surrogate values, in that they are specific to head-on shell-on shrimp and

apply to at least part of the POI, covering the period October 1, 2002 through September 30,

2003.  *See Allied Pacific II*, 32 CIT at __, 587 F. Supp. 2d at 1345.

      Red Garden objects that Commerce unlawfully refused to calculate count-size specific

surrogate values for the unprocessed shrimp purchases of Red Garden's suppliers.  Pl.'s

Mem. 44.  The court concludes this refusal is inadequately explained in the Decision

Memorandum.  What is clear is that Commerce applied a single raw head-on shell-on shrimp

surrogate value for all of Red Garden's subject shrimp rather than determining individual values

for the different count-sizes of shrimp Red Garden sold.  *Red Garden Analysis Mem.* 3 ("Unlike

the shrimp surrogate values applied to [two other respondents] where the Department used a

count size specific surrogate value, the Department is *not* applying a count size specific

surrogate value to the portion of Red Garden's sales that use the whole shrimp input.").  The

reasoning for the Department's doing so, however, is less clear.  Commerce stated that it was

"not using the whole shrimp input based on our findings at verification where we found that Red

Garden did not purchase shrimp on a count-size specific basis," *id.*, and cited an exhibit to the

verification Commerce conducted of one of Red Garden's suppliers, Mingfeng, *Mem. from Case*

*Analysts to the File* exhibit 17 (Sept. 22, 2004) (Admin. R. Doc. No. 1001) ("*Red*

*Garden/Mingfeng Verification Rept.*").  This exhibit consists of a summary table entitled

"Worksheet for Shrimps Inputs," which includes a monthly recording of the quantities of shrimp

Mingfeng processed, in the categories of "Self-farmed Shrimps," "Farmed Shrimps-Purchased,"

and "Ocean Shrimps," and also includes copies of Mingfeng's internal inventory control

documents.  *Id.*

It is difficult for the court to reconcile the first part of the Department's reasoning, that it

was "not using the whole shrimp input," with statements in the Decision Memorandum that

shrimp was the "main input accounting for a significant portion of normal value" and the "most

important factor of production . . . ."  *Decision Mem.* 14.  The relevance of the second part of the

Department's reasoning, that "Red Garden did not purchase shrimp on a count-size specific

basis," needs further explanation.  For a respondent such as Red Garden, which does not produce

the subject merchandise, Commerce calculates normal value based on the factors of production

of the producing companies.  *Section D Questionnaire* D-2.  Commerce does not explain why it

is not significant that Red Garden's suppliers purchased their unprocessed shrimp input by count

size.  Though citing a record document pertaining to one supplier, Commerce did not find that

any of Red Garden's suppliers did not purchase shrimp by count size.  *Red Garden Analysis*

*Mem.* 3.  The record appears to contain evidence that Red Garden sold shrimp by count size,

which at least suggests that the Department apparently considered Red Garden's sales to have

been count-size-specific.  *Red Garden/Mingfeng Verification Rept.* 6 ("All sales made by Red

Garden were based on a per-pound basis segregated by the size of the shrimp . . .").  If, on

remand, the Department again decides not to determine Red Garden's margin using count-size

specific surrogate values, it must support that decision with an adequate explanation.

Moreover, the Department's finding that the Ecuadorean data were not publicly available

was not supported by substantial evidence.  In support of this determination, Commerce cited a

letter from the Central Bank of Ecuador, which supplied the Ecuadorean data to Red Garden,

stating that "these reports are not yet available in Banco Central website." *Decision Mem.* 15.

Commerce reasoned from this letter that these data were not publicly available because they are

"not available to the public without making a specific request to the Central Bank of Ecuador,

who ultimately determine whether to provide the data to the public." *Id.* The same letter from

the Central Bank of Ecuador states that this "information is already publicly available, but we

hope to have them up in our website soon for public viewing . . . ." *Id.* Commerce attempts to

downplay the letter's clear statement that the provided data were publicly available by arguing

that "[s]uch previously non-public information is also of unknowable internal and external

validity unless verification is conducted." *Id.* The fact that the data were not yet on a website

does not establish that the data were not publicly available. According to the Department's

published interpretation of the regulation that contains the preference for publicly available data,

data need not be published in order to be "public." *See Antidumping Duties; Countervailing

Duties*, 61 Fed. Reg. 7,308, 7,344 (Feb. 27, 1996) ("*Proposed Regs.*") (stating that the regulation

"drops the preference for published information, limiting the preference to publicly available

information."); *see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296,

27,367 (May 19, 1997) ("*Preamble*") ("[T]he Department elected to codify a preference for

publicly available information rather than publicly available published information.").

Defendant's arguments in support of the Department's determination are not persuasive.

Defendant argues that "the record provides substantial evidence that the vast majority of raw

material purchased by Nekkanti was head-on, shell-on shrimp." Def.'s Resp. 31. This argument

mischaracterizes the record in this case. As Commerce came to recognize in the *Allied Pacific*

litigation, Commerce erred in failing to recognize the serious flaw in the Nekkanti financial

statement data.  Both Nekkanti's questionnaire response and Nekkanti's ranged data show that a

significant portion of the shrimp purchased by Red Garden's suppliers was partially processed.

*See Allied II*, 32 CIT at __, 587 F. Supp. 2d at 1343.  Defendant argues in the alternative that,

even if the Nekkanti financial statement data include some purchases of partially-processed

shrimp, the record lacks reliable data that Commerce could have used to adjust the surrogate

value to remove such purchases.  Def.'s Resp. 32.  The alleged absence of record data suitable

for correcting the obvious deficiency in the Nekkanti financial statement data is not a plausible

argument for why the Department's use of the Nekkanti financial statement data should be

sustained by the court.

Defendant further argues that Commerce was justified in refusing to rely on the

Ecuadorean data, stating that the "record also demonstrates that the Ecuadorian data are not

reliable surrogate values because they are export prices, which Commerce prefers not to use."

*Id*. at 39.  In addition, defendant argues that the "Ecuadorian prices are not from the appropriate

surrogate country selected by Commerce for this investigation.  Commerce selected *India* as the

appropriate surrogate country."  *Id.* at 40.  These arguments were not part of the reasoning by

which Commerce rejected the Ecuadorian data and, therefore, cannot justify the choice of the

Nekkanti financial statement data.

Finally, defendant argues that Commerce had discretion to choose the Nekkanti financial

statement data, arguing that it was not sufficient for Red Garden to identify alternative data sets

that Commerce might reasonably have chosen as the surrogate value and that Commerce

sufficiently explained how the Nekkanti data were the most reliable on the record.  *Id.* at 40-43.

Commerce does not have discretion to choose information for use as a surrogate value absent a

finding, supported by substantial evidence on the record viewed as a whole, that the information

is the best available information.

Because the record, viewed in the entirety, does not contain substantial evidence that the

Nekkanti financial statement data were the best available information, Commerce must

redetermine the surrogate value for raw, head-on, shell-on shrimp for use in calculating the

normal value of Red Garden's subject merchandise.

C.  Red Garden is Not Entitled to Relief on its Challenge to the Surrogate Value for Shrimp Feed

Commerce based the surrogate value for one of the factors of production of Red Garden's

suppliers, shrimp feed, on World Trade Atlas import data for Indian Harmonized Tariff Schedule

("Indian HTS") subheading 2309.90.31 ("Prawn and shrimps feed"), which reflected an average

unit value ("AUV") of $1.31 per kilogram.  *Prelim. Factor Valuation Mem.* 9 & exhibit 4.  In

choosing the AUV shown by the Indian HTS data, Commerce rejected as alternative sources

three financial statements of Indian companies: the April 1, 2002-March 31, 2003 statement of

Avanti Feeds Limited ("Avanti") ($0.80 per kilogram AUV); the April 1, 2003-March 31, 2004

statement of Avanti ($0.86 per kilogram AUV), and the April 1, 2002-March 31, 2003 financial

statement of Goldmohur Foods & Feeds Ltd. ($0.73 per kilogram AUV).  *Decision Mem.* 56-57;

*Letter from Guolian to the Sec'y of Commerce* 9 (Oct. 19, 2004) (Admin. R. Doc. No. 1023)

("*Guolian Case Br.*").[14]  Plaintiff claims that the Department's choice of the Indian HTS data

was unlawful because the data in the Avanti financial statements were more specific to the

---

[14] Each of the three financial statements that Commerce did not use were submitted as
potential surrogate value data by Zhanjian Guolian Aquatic Products Co., Ltd ("Guolian").
*Letter from Guolian to the Sec'y of Commerce* exhibits 5-6 (Sept. 8, 2004) (Admin. R. Doc.
No. 991) (2002-2003 financial statements); *Letter from Guolian to the Sec'y of Commerce*
exhibit 1 (Sept. 20, 2004) (Admin. R. Doc. No. 986) (2003-2004 financial statement).

shrimp feed used by the suppliers of Red Garden and because the Department's analysis in

support of its chosen surrogate value was flawed.  Pl.'s Mem. 52-53.  The court rejects this

claim.

In support of its choice of surrogate value, Commerce found that the Indian HTS data

"contained a broad category of feed types to accurately account for the actual components of the

shrimp feed purchased by Zhanjiang Guolian," which was a respondent that objected to the same

surrogate value as used in the Preliminary Determination.  *Decision Mem.* 57.  Commerce also

found that the Indian HTS price was "more accurate because it represents numerous transactions

from a market economy country" and that because it did not know the "components of Avanti's

shrimp feed," Commerce was unable "to compare and/or match the Avanti shrimp feed with

Zhanjiang Guolian's shrimp feed components."  *Id.*  Commerce also characterized the Avanti

data as "proprietary to that particular company."  *Id.*

The court reaches the merits of Red Garden's objection to the shrimp feed surrogate

value even though Red Garden did not present its objection to Commerce during the

investigation.  As it concedes, Red Garden failed to exhaust its administrative remedies, Pl.'s

Reply Br. to Def.'s Mem. in Resp. to Pl.'s Rule 56.2 Mot. for J. for upon the Agency R. 22

(Oct. 21, 2005), ECF No. 42, a failure that normally would preclude the court from considering

the claim.  Customs Courts Act, § 301, 28 U.S.C. § 2637(d) (the Court of International Trade

shall require exhaustion "where appropriate").  Excusing the failure to exhaust is appropriate

here because Commerce considered Red Garden's objection to the surrogate value when it

addressed the argument advanced by Zhanjiang Guolian.  *Decision Mem.* 56-57; *Guolian Case*

*Br.* 9-10.

Red Garden argues that the Department irrationally chose the Indian HTS data as more accurate than the Avanti data, arguing that the "inclusion of feed for other species cannot more accurately portray what the respondents feed shrimp[.]  Only by using shrimp feed and nothing else, will Commerce calculate an accurate cost."  Pl.'s Mem. 52-53.  Red Garden also takes issue with the Department's statement that the Avanti data were "proprietary," arguing that "the Avanti data is public on the record and hence is public information."  *Id.* at 53.

The record supports with substantial evidence the Department's finding that the Indian HTS data were the best available information on the record for the valuation of the shrimp feed surrogate value.  The record supports findings that the Indian HTS data satisfied each of the Department's criteria because these data are shown to be publicly available, net of taxes and duties, specific to prawn and shrimp feed, contemporaneous with the POI, and a broad market average.  The record also contains substantial evidence that the financial statement data on the record were not as contemporaneous with the POI.  Two of the financial statements applied to the twelve months preceding the POI, and the other applied to the POI as well as the subsequent six months.  Even an average of the data in the three financial statements, which were confined to the purchases of two producers, would not provide as broad a market average as did the Indian HTS data.

The court finds little merit in Red Garden's objection that the Avanti financial statement data are more specific to the input and therefore more accurate than the Indian HTS data, which are confined narrowly to prawn and shrimp feed.  Even if the court were to assume Red Garden to be correct in its assertions that the Avanti data are more specific and that the Department incorrectly categorized the Avanti data as proprietary, the court still would affirm the

Department's choice of surrogate value based on the application of the Department's criteria as

supported by the record evidence, as discussed above.

<u>D.  Commerce Did Not Err in Deriving Red Garden's Surrogate Financial Ratios Solely from
Financial Statements of Integrated Producers</u>

        In determining the normal value of Red Garden's subject merchandise, Commerce based

the surrogate financial ratios for factory overhead and for selling, general and administrative

("SG&A") expenses, and the surrogate financial ratio for profit, on three financial statements of

Indian shrimp producers: the April 2002-March 2003 financial statement of Devi, the April

2002-March 2003 financial statement of Sandhya Marines Ltd. ("Sandhya"), and the April 2003-

March 2004 financial statement of The Waterbase Ltd. ("Waterbase").  *Mem. from Case Analyst

to the File* exhibit 2 (Nov. 29, 2004) (Admin. R. Doc. No. 1112) ("*Final Analysis Mem.*").  This

combination resulted in surrogate values of 6.05% for factory overhead, 8.37% for SG&A

expenses, and 2.37% for profit.  *Id.* at 3.  Also on the record were the April 2002-March 2003

financial statement of the Indian shrimp processor Nekkanti, which showed factory overhead of

5.11%, SG&A expenses of 3.06% and profit of 0.32%, *id.*, and the April 2003-March 2004

financial statement of Indian shrimp processor Avanti, for which Commerce did not calculate

financial ratios separately, *Letter from Guolian to the Sec'y of Commerce* exhibit 1 (Sept. 20,

2004) (Admin. R. Doc. No. 986) ("*Avanti Financial Statement*").  Red Garden claims that it was

unlawful for Commerce to exclude the financial statements of Nekkanti and Avanti from the

surrogate value calculation.  The court does not find merit in this claim.

        For the Preliminary Determination, Commerce based the surrogate financial ratios on the

financial statements of Devi, Sandhya, and Nekkanti, yielding factory overhead of 5.81%,

SG&A expenses of 4.09% and profit of 1.79%.  *Prelim. Factor Valuation Mem.* 16.  For the

Final Determination, Commerce determined that averaging the data for Devi and Sandhya with

the data of Waterbase, rather than those of Nekkanti, would yield the best available information,

stating that this combination "would more accurately match Red Garden's aquaculture

experience and expenses" than would a combination including the financial data of Nekkanti.

*Red Garden Analysis Mem.* 5.  The Department characterized its chosen combination as "an

average of three integrated surrogate companies" and explained that "integrated companies"

were those that "participate in aquaculture activities, rather than solely processing shrimp, as

Nekkanti does." *Id.*  Commerce previously considered Red Garden to be an integrated producer

for purposes of the investigation, *Prelim. Factor Valuation Mem.* 16, and in this respect the court

observes that the record indicates that Red Garden, during the POI, had suppliers that were

integrated producers.  *See June 8 Questionnaire Resp.* 22 ("Mingfeng both grows and buys live

shrimp for processing.  Long Feng buys wild shrimp and grows cultivated shrimp itself.").  In

response to comments from Guolian, Commerce stated in the Decision Memorandum that the

financial statement of another Indian company, Avanti, should not be included in the surrogate

financial ratio calculations because there "is no evidence on the record that Avanti is an

integrated producer of subject merchandise" and that Avanti is "primarily, a shrimp feed

producer, with the majority of their resources focused on their shrimp feed and shrimp

processing business activities." *Decision Mem.* 62.

        Red Garden claims that Commerce failed to use the best available information for the

surrogate financial ratios, arguing that "Commerce would more accurately calculate the financial

ratios by including financial statements for both integrated and non-integrated producers in

India, especially if they encompass the POI." Pl.'s Mem. 54.  It argues, further, that "Red

Garden's situation was unique–it was not solely a processor and not solely an integrated

producer," and that accordingly the Department's reliance on only the financial statements of

integrated producers, excluding those of any non-integrated shrimp processors, was unlawful.

*Id.* at 55.

Before reaching the merits of this argument, the court first rejects defendant's argument

that, by failing to include in its case brief an argument challenging the surrogate financial ratios,

Red Garden failed to exhaust its administrative remedies.  Def.'s Resp. 49-50.  Red Garden was

not required to raise this issue before the Department to exhaust administrative remedies because

the Department's determination of these surrogate values changed between the Preliminary

Determination and the Final Determination.  In the Preliminary Determination, Commerce

constructed these values from the financial statements of two integrated shrimp producers, Devi

and Sandhya, and one non-integrated shrimp processor, Nekkanti.  *Prelim. Factor Valuation*

*Mem.* 16.  In the Final Determination, Commerce excluded from its calculations the financial

statement of Nekkanti, a shrimp processor, in favor of the financial statement of Waterbase, an

integrated shrimp producer.  *Final Analysis Mem.* exhibit 2.  Because the ultimate composition

of the financial statements appeared in the Final Determination but not in the Preliminary

Determination, and because the resulting surrogate values were different, the court hears Red

Garden's claim.

On the merits, the court determines that the claim does not merit relief.  As the court

discussed above, when Commerce determines normal value using factors of production, the

statute requires that Commerce chose the "best available information regarding the values of

such factors in a market economy country or countries considered to be appropriate by the

administering authority." 19 U.S.C. § 1677b(c)(1).  As the court also discussed previously,

Commerce looks to "review period-wide price averages, prices specific to the input in question,

prices that are net of taxes and import duties, prices that are contemporaneous with the period of

investigation or review, and publicly available data." *Decision Mem.* 14 (emphasis omitted).

According to the Department's uncontested findings, Devi, Sandhya, and Waterbase, like

Red Garden's suppliers, were integrated shrimp producers, *i.e.*, they processed shrimp they had

grown. *June 8 Questionnaire Resp.* 22 (regarding Red Garden's suppliers); *Letter from*

*Petitioners to Sec'y of Commerce* attachments 1 & 3 (Sept. 8, 2004) (Admin. R. Doc. No. 975)

("*Petitioners' Factor Values*").  The record establishes that Nekkanti, on the other hand, did not

grow shrimp. *Petitioners' Factor Values* attachment 4.  The Department's findings that there is

"no evidence on the record that Avanti is an integrated producer of subject merchandise" and

that Avanti's business activities focus on shrimp feed, *Decision Mem.* 62, are supported by

Avanti's financial statement, which states that "[s]hrimp are purchased from the farmers," *Avanti*

*Financial Statement* 44, and shows that Avanti's "Feed Division" constitutes the vast majority of

its operations, *id*. at 9.

Red Garden argues, correctly, that the Avanti financial statement, which applies to the

April 2003 to March 2004 period, is contemporaneous with the POI (April 1, 2003-

September 31, 2003) and that the April 2002-March 2003 financial statements of Devi and

Sandhya are not.  Commerce chose, nevertheless, to exclude the Avanti data from its

determinations because Avanti, unlike Devi, Sandhya, and Waterbase, was not an integrated

producer and was primarily a shrimp feed producer.  The record supports the Department's

finding that Avanti, in these two significant respects, had operations dissimilar to those of Red

Garden's suppliers, and the Department permissibly gave less probative weight to the

contemporaneity of the Avanti data than it did to the dissimilarity between Avanti's operations

and those of Red Garden's suppliers.  As the record also shows, Nekkanti was dissimilar to Red

Garden's suppliers in one of those respects–it was not an integrated supplier–and its financial

statement was not contemporaneous with the POI.  *Petitioners' Factor Values* attachment 4.  For

these reasons, the court concludes that substantial evidence on the record considered as a whole

supported the Department's finding that the operations of Devi, Sandhya, and Waterbase were

sufficiently similar to those of Red Garden's suppliers that the record data from the financial

statements of these three companies constituted the best available information with which to

determine surrogate financial ratios.

        In contesting the Department's decision, Red Garden argues that its suppliers were in a

"unique" position because they processed not only shrimp they had grown but also shrimp they

had purchased.  This argument does not present a convincing reason why the court must disallow

the Department's choice of the Devi, Sandhya, and Waterbase data.  Although it may well have

been permissible on this record for Commerce to have included the data of a non-integrated

supplier in that database, Red Garden cannot show that Commerce acted contrary to law in

declining to do so.  Red Garden does not show that the record lacked substantial evidence to

support the individual factual findings by which Commerce concluded that the operations of

Nekkanti and Avanti were less similar to those of Red Garden's suppliers than were the

operations of Devi, Sandhya, and Waterbase.  The ultimate determination to use the data of the

three integrated suppliers, which was consistent with and supported by these various findings,

was within the discretion provided to the Department by 19 U.S.C. § 1677b(c)(1).

E.  Commerce Unlawfully Refused to Use the Accurate and Verified Data on the Total
Production of One of Red Garden's Suppliers

As explained previously, for non-producing exporters from non-market economy

countries, Commerce determines normal value using the factors of production of the companies

that supplied the subject merchandise.  In doing so, Commerce determines the total quantity of

subject merchandise each supplier provided so that it may create a weighted-average factor of

production.

The amount Commerce used to represent the total quantity of Mingfeng's production was

lower than the actual amount because it omitted several product categories.  *Decision*

*Mem.* 24-25.  Commerce used the incorrect amount even though the correct amount was present

on the record, Red Garden having previously reported it and Commerce having confirmed it as

correct in the verification Commerce conducted on Mingfeng.  *Id.*  Plaintiff argues that

Commerce acted unlawfully in using the incorrect amount and that the error artificially increased

Red Garden's weighted-average dumping margin.  Pl.'s Mem. 57-58.  The court concludes that

Commerce acted without authority in using the incorrect amount as "facts otherwise available"

and that the error must be corrected on remand.

In April 2004, Commerce requested that Red Garden "[r]eport the total quantity of the

subject merchandise produced in each factory during the POI," and in response, Red Garden

provided a total quantity amount for Mingfeng.  *Apr. 21 Questionnaire Resp.* D-5.  In a June 8,

2004 questionnaire response, Red Garden, in response to the Department's request, included a

table listing the factors of production Mingfeng used to produce each product type, identified by

individual control number ("CONNUM"), and the quantity Mingfeng produced of each

CONNUM.  *June 8 Questionnaire Resp.* exhibit SD-2(a).  The sum of the quantities in this table

did not agree with, and was approximately 10% less than, the total quantity of subject

merchandise produced by Mingfeng as shown in Red Garden's April 21, 2004 questionnaire

response.

Commerce provided additional instructions to Red Garden in the July 26, 2004 Third

Supplemental Questionnaire. *Third Supplemental Questionnaire* 2. Commerce requested that

Red Garden "recalculate the FOPs for Red Garden's suppliers" and "resubmit" a table detailing

the "quantity of production of subject merchandise by CONNUM group . . . for each supplier."

*Id.* Commerce specified that, to recalculate the FOPs, Red Garden should divide each supplier's

total usage of the FOP (the "FOP Numerator") by each supplier's total output of CONNUMs

utilizing that FOP (the "FOP Denominator"). *Id.* attachment II. Commerce further instructed

Red Garden that the total output amounts used as FOP Denominators must reconcile with the

total output amounts for each CONNUM and supplier listed in the separate production table. *Id.*

at 2.

In its response to the Third Supplemental Questionnaire, submitted on August 5, 2004,

Red Garden continued to calculate Mingfeng's FOPs using total production quantities that could

not be reconciled with the table of CONNUM-specific production volumes, which Red Garden

resubmitted.[15] *Aug. 5 Questionnaire Resp.* exhibits 2(A), 3. The Department then held a

conference call in which it instructed Red Garden to remedy the discrepancy, directing "that Red

Garden must match or reconcile its FOP denominators," *i.e.*, the total production by each

_____

[15] The quantities used to calculate FOPs in this questionnaire response are not entirely
legible in the document the court examined, but some these quantities appear to match the total
quantity reported in the April 21, 2004 questionnaire response. *Letter from Red Garden to the
Sec'y of Commerce* exhibit 2(A) (Aug. 5, 2004) (Admin. R. Doc. No. 960) ("*Aug. 5
Questionnaire Resp.*").

supplier of the CONNUM utilizing an FOP, "to the appropriate product/CONNUM groups," *i.e.*,

to the amount reported in the separate production volume table.  *Mem. from Analyst to the File* 1

(Aug. 9, 2004) (Admin. R. Doc. No. 877).

      Following the conference call, Red Garden filed on August 13, 2004 a letter explaining

"why the denominators used do not reconcile to the quantity if one sums individual control

numbers ('connums')."  *Letter from Red Garden to the Sec'y of Commerce* 2 (Aug. 13, 2004)

(Admin. R. Doc. No. 914) ("*Red Garden's Aug. 13 Resp.*").  Red Garden explained that the

"denominators used reflect the total production of the subject merchandise," and that its

suppliers "maintain data on 27 product groups of subject merchandise."  *Id.*  Red Garden told

Commerce that the Mingfeng data used for FOP Denominators do not reconcile to amounts

listed in the production volume table for Mingfeng because "Red Garden only sold 23 of those

product groups in the POI to the U.S.," *id.*, and, presumably, the production volume table listed

only the amounts produced for sales to the United States.  Red Garden once again calculated

FOPs using total production amounts that were not reconcilable with the table listing production

amounts by CONNUM and supplier.[16]  *Id.* exhibits 2-3.

      Commerce subsequently conducted a verification of Mingfeng, at which Commerce

determined from Mingfeng's records that each CONNUM Mingfeng supplied Red Garden was

supplied for sales to the United States.  *Red Garden/Mingfeng Verification Rept.* 2, 16-17.

According to the Department's report of that verification, Mingfeng company officials, after

finding that two products erroneously had been listed in the records as not supplied for sales to

---

[16] Some of the quantities used to calculate FOPs in this letter appear to match the total
quantity reported in the April 21, 2004 questionnaire response.  *Letter from Red Garden to the
Sec'y of Commerce* exhibit 2 (Aug. 13, 2004) (Admin. R. Doc. No. 914).

the United States, "indicated that all other product codes listed in the 'Products Produced but Not

Sold to the US' category . . . were in fact sold through Red Garden to the United States during

the POI." *Id.* at 17.  Based on this finding, Commerce, "[f]or purposes of factor ratio

calculations . . . verified the total quantity produced by Mingfeng," including "the additional

product codes which were misreported as having not been sold to the United States" and

determined that the correct total production amount was the same amount that Red Garden

reported in the April 21, 2004 questionnaire response.  *Id.*

On October 19, 2004, approximately one month after its own verification, Red Garden

requested in its case brief that Commerce use the total production quantity Red Garden had

reported for Mingfeng in the April 21, 2004 questionnaire response, rather than the incorrect

total that was later shown in the data reported in the separate tables, to weight-average the FOPs

of Mingfeng and Longfeng.  Red Garden gave as the cause of the error in the tables that

"Mingfeng's accounting staff, not knowing the technical names of various types of shrimp,

incorrectly determined what types of shrimp products were sold to the U.S." *Letter from Red*

*Garden to the Sec'y of Commerce* 5-6 (Oct. 19, 2004) (Admin. R. Doc. No. 1040) ("*Red*

*Garden's Case Br.*").  In support of its request to use the correct total, Red Garden stated in its

case brief that "all of Mingfeng's factor-of-production data, including the total production

quantity needed for this re-calculation, was verified by the Department" and that "such

recalculation results in a lower weighted-average FOP for the two suppliers which in tu[rn] leads

to a lower dumping margin." *Id.* at 6.

Commerce refused Red Garden's request to use the verified quantity for Mingfeng's total

production, explaining in the Decision Memorandum that it decided instead to use the quantity

from the separate tables as facts otherwise available.  *Decision Mem.* 24-25.  Commerce decided

to use the lower quantity for Mingfeng's total production even though it knew as a result of the

Mingfeng verification that this information was incorrect.  Commerce grounded this decision in

section 776(a) of the Tariff Act, 19 U.S.C. § 1677e(a), the "facts otherwise available" provision,

giving as its justification that "Red Garden failed to provide such information by the deadlines

established by the Department in their supplemental questionnaires or as part of their pre-

verification corrections."  *Decision Mem.* 24.  Commerce explained, further, that it considered

the use of facts otherwise available appropriate "because Red Garden did not provide the

Department with the correct Quantity and Value for Mingfeng on *three* separate occasions," *i.e.*,

the June 8, 2004 questionnaire response, the August 5, 2004 questionnaire response, and the

response to the August 2004 conference call.  *Id.* at 25.

      Red Garden challenges the Department's decision to use facts otherwise available, stating

that the "minor calculation error committed by Mingfeng was submitted to the [Department] in

conformity with the statute," and citing section 782 of the Tariff Act, 19 U.S.C. § 1677m(e), as

requiring "the government to accept all information proffered by a respondent if it meets certain

tests."  Pl.'s Mem. 57.  Plaintiff argues that the information submitted met each criterion in

§ 1677m(e) and that "Red Garden was dependent upon its unrelated suppliers for the accuracy of

the data.  The cause of the error was inadvertence to the extent that certain Mingfeng personnel

did not appreciate that certain product codes were identical to other products that were sold to

the U.S. in the POI."  *Id.*

      In determining Red Garden's margin, the Department had the choice of using the correct

amount, or the incorrect amount, of Mingfeng's total production.  It erred in using the incorrect

amount.  As the Court of Appeals has instructed repeatedly, the purpose of the antidumping

statute is to "establi[sh] antidumping margins as accurately as possible."  *Shakeproof Assembly*

*Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001); *D & L Supply Co. v. United*

*States*, 113 F.3d 1220, 1223 (Fed. Cir. 1997); *Rhone Poulenc, Inc. v. United States*, 899 F.2d

1185, 1191 (Fed. Cir. 1990) ("the basic purpose of the statute [is] determining current margins as

accurately as possible.").  The use of information that the Department knew to be incorrect is

contrary to the purpose.  The statutory authority to use "facts otherwise available" on which

Commerce relied to justify its decision is unavailable on the record facts of this case.

Section 776(a) of the Tariff Act directs Commerce to use facts otherwise available when

"necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), and also

provides for the use of facts otherwise available in certain situations in which the necessary

information *is* available, *id.* § 1677e(a)(2).  These situations are when "an interested party . . .

withholds information that has been requested by the administering authority," *id.*

§ 1677e(a)(2)(A), "fails to provide such information by the deadlines for submission of the

information or in the form and manner requested, subject to subsections (c)(1) and (e) of section

1677m of this title," *id.* § 1677e(a)(2)(B), "significantly impedes a proceeding under this

subtitle," *id.* § 1677e(a)(2)(C), or provides information that is unverifiable, *id.* § 1677e(a)(2)(D).

Of these various criteria, Commerce invoked the criterion that the information in question was

untimely submitted.  *Decision Mem.* 24 (finding that Red Garden "failed to provide such

information by the deadlines established by the Department in their supplemental questionnaires

or as part of their pre-verification corrections.").  However, the particular item of information

that the Department refused to use, in favor of information it knew to be incorrect, was in the

Department's possession as a result of Red Garden's April 21, 2004 questionnaire response,

*Apr. 21 Questionnaire Resp.* D-5, a questionnaire response that Commerce did not find to have

been untimely.

Commerce did not find that Red Garden failed to provide the information at issue "in the

form and manner requested," as that phrase is used in 19 U.S.C. § 1677e(a)(2)(B), and the record

casts doubt on whether such a finding could have been supported on this record.  It appears from

the record and from the Department's own analysis that the information Commerce needed for

an accurate margin calculation at the time of preparing the Decision Memorandum, and

nevertheless rejected, was the total production amount for Mingfeng, not the information in the

tables that Red Garden was unable to reconcile with that amount.  The court concludes that the

Department's intentional use of the incorrect information and its failure to use the correct

information were unauthorized by 19 U.S.C. § 1677e(a).

The Department's lack of authority under 19 U.S.C. § 1677e(a) to refuse to use the

correct information is sufficient to require a remand.  However, another statutory provision calls

the Department's decision into further question.  If the court presumes, as it appears, that

Commerce considered the correct quantity information not to have met all of its established

requirements for submission, it also would conclude that the statute required Commerce to make

a further determination before declining to use that information.  Section 776(a) conditions on

subsections (c)(1) and (e) of 19 U.S.C. § 1677m the Department's applying facts otherwise

available in the circumstance of untimely submission of requested information.  19 U.S.C.

§ 1677e(a)(2)(B).  Subsection (e) of § 1677m, requires Commerce, in that circumstance, to use

information that is necessary to the Department's determination but does not meet all of the

Department's established requirements.[17]  In the Decision Memorandum, the Department did not

address whether this provision required it to use the correct data on Mingfeng's total production

despite the Department's finding that Red Garden had not complied with its instructions to

reconcile the data in the tables with the total amount of Mingfeng's production reported in the

April 21, 2004 questionnaire.

Before the court, defendant argues that the Department was justified in using the

incorrect production amount for Mingfeng because "a correction would have rewarded Red

Garden for its inaccurate reporting to Commerce by lowering its calculated margin." Def.'s

Resp. 43.  This argument is an *ex post* rationalization.  Commerce did not base its refusal to

make the correction on the importance of not rewarding inaccurate reporting.  A court must

review an agency's decision on the grounds the agency puts forth.  *SEC v. Chenery*, 318 U.S. 80,

87 (1943).

Moreover, even had the Department's rationale been to avoid rewarding inaccurate

reporting, the court would reject defendant's argument.  Such a rationale would be appropriate to

a finding under 19 U.S.C. § 1677e(b) that Red Garden had "failed to cooperate by not acting to

---

[17] Under subsection (e) of section 782 of the Tariff Act, Commerce

[S]hall not decline to consider information that is submitted by an interested party
and is necessary to the determination but does not meet all the applicable
requirements established by the administering authority or the Commission, if--
   (1) the information is submitted by the deadline established for its submission,
   (2) the information can be verified,
   (3) the information is not so incomplete that it cannot serve as a reliable basis for
   reaching the applicable determination,
   (4) the interested party has demonstrated that it acted to the best of its ability in
   providing the information and meeting the requirements established by the
   administering authority or the Commission with respect to the information, and
   (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

the best of its ability" to comply with a request for information.  Commerce made no such

finding, and on this record it would appear that a finding to that effect could not have been

supported.  The record shows that Red Garden had difficulty attempting to reconcile the data on

the total amount of Mingfeng's production with the product-specific production data that

Mingfeng provided it.  The record contains some evidence that, as Red Garden informed

Commerce, the difficulty in reconciling the data sets was the result of an error by Mingfeng.

Commerce did not find to the contrary.  What is more, it appears from the record that Commerce

found the source of the error in Mingfeng's records at the Mingfeng verification.  As the

Department's own report of the Mingfeng verification reveals, Red Garden's reporting of total

production volume by supplier and CONNUM omitted sales of several of Mingfeng's

CONNUMs, an omission Red Garden attributes to incorrect reporting by Mingfeng.  *Red

Garden/Mingfeng Verification Rept.* 16-17; *Red Garden's Case Br.* 5-6.  Even though

Commerce made no finding under 19 U.S.C. § 1677e(b) that Red Garden failed to cooperate, the

Department's decision to use the incorrect information resulted in an adverse consequence for

Red Garden.  In deciding to use information that understated Mingfeng's total production

amount by approximately 10%, Commerce impermissibly inflated Red Garden's weighted-

average dumping margin.

        In summary, Commerce acted unlawfully in using information it knew to be incorrect and

in refusing to make a straightforward adjustment that would have produced a more accurate

result.  On remand, Commerce must redetermine Red Garden's normal value using the correct

information on the quantity of Mingfeng's production.

### F.  Commerce Must Redetermine the Surrogate Value for Labor Expenses

Red Garden contends that the Department's selection of a surrogate value for labor expenses was unlawful.  Pl.'s Mem. 49-52.  Defendant requests a voluntary remand "for the limited purpose of recalculating the labor wage rate using proper data."  Def.'s Resp. 57.  The court will order remand on this issue.

Commerce calculated a surrogate value for labor expenses pursuant to 19 C.F.R. § 351.408(c)(3) (2005), which required that for market economy countries Commerce "use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries," and for non-market economies, such as China, Commerce "will calculate the wage rate to be applied . . . each year."  The Court of Appeals invalidated that regulation in *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372-73 (Fed. Cir. 2010).  As such, remand is appropriate to allow the Department to determine a surrogate value for labor according to a lawful method.

In its reply and in the July 2011 conference the court held with the parties, Red Garden advocated that the court's remand on this issue direct particular results.  In the reply, Red Garden requested an order that Commerce "delete all countries not found to be at the same level of economic development as China" from the data used to calculate a surrogate labor rate.  Pl.'s Reply 24-25.  And in the July 2011 conference, Red Garden argued that the labor rate applied to Red Garden cannot exceed the rate applied to the other mandatory respondents at the conclusion of the *Allied Pacific* litigation.  Upon considering plaintiff's arguments and defendant's counter-arguments, the court declines to direct the result upon remand.  The court will require that the

remand redetermination accord with law, be supported by substantial evidence, and comply with

the decision of the Court of Appeals in *Dorbest*.

### G.  Commerce Must Reconsider its Refusal to Allow Correction of the Growth Stage Multiplier for Longfeng

Red Garden contends that the Department's refusal to correct a clerical error regarding

the "growth stage multiplier" of one of Red Garden's suppliers, Longfeng, was unlawful.  Pl.'s

Mem. 59-60.[18]  Defendant requests a voluntary remand "for the limited purpose of considering

and addressing Longfeng's revised growth stage multiplier data."  Def.'s Resp. 57.  The court

will order remand on this issue.

Red Garden states that Commerce arbitrarily refused to accept a corrected growth stage

multiplier that Red Garden submitted on the first day of verification, Pl.'s Mem. 58-59; *Red*

*Garden/Mingfeng Verification Rept.* exhibit 1, and resubmitted prior to the Final Determination,

*Letter from Red Garden to the Sec'y of Commerce* (Nov. 26, 2004) (Admin. R. Doc. No. 1110).

The incorrect growth stage multiplier stated that for one of Red Garden's suppliers, Longfeng,

more than 100% of the farmed shrimp were used in processing, a logical impossibility.  Pl.'s

Mem. 58-59.  Although Commerce required Red Garden to submit a revised sales database with

minor corrections, Commerce without explanation refused to allow plaintiff to correct the growth

stage multiplier.  Def.'s Resp. 57-58.  Defendant now seeks a remand to allow Commerce to

reconsider this decision.  *Id.*  The court considers such reconsideration to be appropriate.

---

[18] A "growth stage multiplier" refers to the percentage of shrimp grown by a producer
that eventually are used in processing.  Pl.'s Mem. 58.

### III. CONCLUSION AND ORDER

The court concludes that Red Garden is entitled to relief on its challenge to the

Department's use of an adverse inference regarding the factors of production of Meizhou, its

challenge to selection of a surrogate value for head-on shell-on shrimp, and its challenge to the

Department's refusal to use correct data regarding the volume of Red Garden's sales supplied by

Mingfeng.  In addition, the court will order Commerce on remand to redetermine Red Garden's

surrogate labor rate and to reconsider the decision to refuse to allow correction of Longfeng's

growth stage multiplier.  Red Garden is not entitled to relief on its challenge to the Department's

selection of a surrogate value for shrimp feed and on its challenge to the Department's selection

of surrogate financial ratios.

Therefore, upon consideration of all proceedings and submissions herein, and upon due

deliberation, it is hereby

**ORDERED** that plaintiff's motion for judgment on the agency record challenging the
*Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen & Canned
Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 70,997 (Dec. 8, 2004)
("Final Determination") and the *Notice of Amended Final Determination of Sales at Less Than
Fair Value & Antidumping Duty Order: Certain Frozen Warmwater Shrimp from the People's
Republic of China*, 70 Fed. Reg. 5,149 (Feb. 1, 2005) ("Amended Final Determination") be, and
hereby is, GRANTED in part and DENIED in part; it is further

**ORDERED** that the Final Determination and Amended Final Determination be, and
hereby are, remanded to the International Trade Administration, U.S. Department of Commerce
("Commerce" or the "Department") for redetermination in accordance with this Opinion &
Order; it is further

**ORDERED** that, on remand, Commerce shall issue a Remand Redetermination that
recalculates the weighted-average dumping margin of Shantou Red Garden Foodstuff Co., Ltd.
("Red Garden"), is supported by substantial evidence on the record, and is in all respects in
accordance with law; it is further

**ORDERED** that, on remand, Commerce shall not use an adverse inference in choosing
from among the facts otherwise available for use as factors-of-production data pertaining to

subject merchandise sold by Red Garden and produced by Meizhou Aquatic Products Quick-Frozen Industry Co., Ltd.; it is further

     **ORDERED** that, on remand, Commerce shall redetermine the surrogate value or values for the fresh, raw, head-on, shell-on shrimp used by plaintiff's suppliers; it is further

     **ORDERED** that, on remand, Commerce shall reconsider the decision not to apply count-size specific surrogate values for the fresh, raw, head-on, shell-on shrimp used by plaintiff's suppliers, and, if Commerce maintains that decision in the Remand Redetermination, then Commerce shall provide an adequate explanation based on findings of fact supported by substantial record evidence; it is further

     **ORDERED** that, on remand, Commerce, in redetermining the weighted-average dumping margin of Red Garden, shall use the correct data regarding the volume of Red Garden's sales that were supplied by Shantou Jinyuan District Mingfeng Quick-Frozen Factory ("Mingfeng"); it is further

     **ORDERED** that, on remand, Commerce shall redetermine the surrogate value of labor expenses applied to Red Garden and shall provide an explanation for its decision on remand that is in all respects supported by substantial evidence and in accordance with law, adhering to the holding of the U.S. Court of Appeals for the Federal Circuit in *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372-73 (Fed. Cir. 2010); it is further

     **ORDERED** that, on remand, Commerce shall reconsider its decision to use incorrect data regarding the growth stage multiplier of Shantou Longfeng Foodstuff Co., Ltd. ("Longfeng") and take any corrective action necessitated by that reconsideration; and it is further

     **ORDERED** that Commerce shall file the Remand Redetermination with the court within sixty (60) days of this Opinion & Order, that plaintiff shall file any comments thereon within thirty (30) days of the date on which the Remand Redetermination is filed, and that defendant shall file any response to plaintiff's comments within fifteen (15) days of the date on which plaintiff files comments.

                           /s/ Timothy C. Stanceu
                           Timothy C. Stanceu
                           Judge

Dated: January 13, 2012
      New York, New York